KASPARE COHN COMPANY LIMITED (FORMERLY RAYBEN LIMITED), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

KASPARE COHN, INCORPORATED, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53696, 58428.  Promulgated March 11, 1937.

*Carl Taylor, Esq., Thomas R. Dempsey, Esq., Rollin Browne, Esq., Hugh Satterlee, Esq., A. Calder Mackay, Esq.,* and *Todd W. Johnson, Esq.,* for the petitioners.

*Mason B. Leming, Esq., C. A. Ray, Esq., Paris B. Claypoole, Esq.,* and *Charles W. Donnally, Esq.,* for the respondent.

OPINION.

MELLOTT: Petitioners contend that Rayben Limited, the Canadian corporation, was the owner of the gas stocks (stock in the Southern California Gas Co. and stock in the Midway Gas Co.) when they were exchanged in 1927, for cash and bonds of the Southern California Gas Corporation. This ownership, it is argued, was complete and unconditional and had its inception in May 1927 at, or shortly after the incorporation of Rayben Limited, when Cohn, Inc., the domestic corporation, transferred the gas stocks owned by it to Rayben Limited in exchange for the capital stock of the latter corporation. It is therefore insisted that the sale was made by the Canadian corporation, in Canada, and that any profit derived therefrom does not constitute income taxable in the United States.

Respondent contends that the sale of the gas stock (we shall discuss later the exchange and reorganization feature of this transaction, but for present purposes, shall refer to the exchange of the gas stocks for the cash and bonds simply as a sale) was in truth and in fact made by Cohn, Inc.; that Rayben Limited was a mere corporate form created by Cohn, Inc., for use as an instrumentality to give the latter a basis for contending that the sale was made in Canada; that it was merely an agency or instrumentality of Cohn, Inc.; and that it was a mere conduit only for passing title to the gas stocks to the purchaser and for receiving the proceeds arising from the sale for Cohn, Inc., which was the actual and beneficial owner of the gas stocks and the proceeds derived from the sale.

The Revenue Act of 1926 provides that the term "gross income", in the case of a domestic corporation, includes gains or profits and

income derived from any source whatever, and in the case of a foreign corporation, the term means only gross income from sources within the United States.[1] It is apparent, therefore, that if Rayben Limited was the owner of the stock in question, as contended by the petitioners, and sold it in Montreal, Canada, it is not required to include the profit resulting from the sale in its gross income. If, however, as contended by the respondent, Cohn, Inc., was the real owner and vendor of the stock it is required to include the profit in its gross income whether the sale was consummated in the United States or in Canada.

Respondent urges that we disregard the separate corporate entity of Cohn, Inc., and Rayben Limited and find that the sale was actually made by Cohn, Inc., while petitioners insist that the separate corporate entity of the two corporations can not be disregarded. Upon brief petitioners say, "The Supreme Court in recent tax cases has had occasion to consider urgent demands for the disregard of corporate entities and in every instance has sustained their full recognition", in support of which they cite: *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435; *Burnet* v. *Commonwealth Improvement Co.*, 287 U. S. 415; *Burnet* v. *Clark*, 287 U. S. 410; *Dalton* v. *Bowers*, 287 U. S. 404; *Planters Cotton Oil Co.* v. *Hopkins*, 286 U. S. 332; *Klein* v. *Board of Supervisors*, 282 U. S. 19.

While it is true that in each of the cited cases the Supreme Court, under the facts before it, applied the general rule that a corporation and its shareholders are to be treated as separate entities, it was careful to point out that "the rule is subject to the qualification that the separate entity may be disregarded in exceptional situations" (*New Colonial Ice Co.* v. *Helvering, supra*) or "under exceptional

---

[1] Sec. 213. (a) * * *

The term "gross income" includes gains, profits, and income derived from * * * businesses, commerce, or sales or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; * * * or gains or profits and income derived from any source whatever.

Sec. 217. (a) In the case of a nonresident alien individual or of a citizen entitled to the benefits of section 262, the following items of gross income shall be treated as income from sources within the United States;

*      *      *      *      *      *      *

(e) * * * Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from sources within the country in which sold, * * *.

(f) As used in this section the words "sale" or "sold" include "exchange" or "exchanged"; * * *

Sec. 233. (a) In the case of a corporation subject to the tax imposed by section 230 the term "gross income" means the gross income as defined in sections 213 and 217, except that mutual marine insurance companies shall include in gross income the gross premiums collected and received by them less amounts paid for reinsurance.

(b) In the case of a foreign corporation, gross income means only gross income from sources within the United States, determined (except in the case of insurance companies subject to the tax imposed by sections 243 or 246) in the manner provided in section 217.

circumstances" (*Burnet* v. *Clark, supra; Dalton* v. *Bowers, supra*) or in cases presenting "peculiar situations." (*Burnet* v. *Commonwealth Improvement Co., supra.*) It is not necessary to set out herein the facts which the Court had before it in the cited cases. Suffice it to state that in none of them was the Court dealing with a foreign subsidiary corporation, the property, management, and activities of which were completely dominated and controlled by a domestic parent corporation which created it for a special purpose.

In the cases relied upon by the respondent, the facts show that the transactions arose under "exceptional circumstances" or presented "peculiar situations." *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330, 337, 338; *Gulf Oil Corporation* v. *Lewellyn*, 248 U. S. 71; *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Association*, 247 U. S. 490, 500, 501; *United States* v. *Lehigh Valley R. Co.*, 220 U. S. 257, 272–274; and *Palmolive Manufacturing Co. (Ontario) Ltd.* v. *The King*, Canada Law Reports, 1935, p. 131. See also *North Jersey Title Insurance Co.* v. *Commissioner*, 84 Fed. (2d) 898, and *Munson S. S. Line* v. *Commissioner*, 77 Fed. (2d) 849. In each of them the court disregarded the separate corporate entity.

The basic reason underlying the disregard of the corporate entities in the cited cases is succinctly expressed by the Supreme Court in *Chicago, M. & St. P. Ry. Co.* v. *Minneapolis Civic & Commerce Association, supra*, in the following language: "Where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose * * * of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. * * * In such a case the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." The rule above quoted is of peculiar importance in tax cases. *Western Maryland Ry. Co.* v. *Commissioner* (C. C. A., 4th Cir.), 33 Fed. (2d) 695.

In *Southern Pacific Co.* v. *Lowe, supra*, a tax, which had been laid upon a holding company for dividends declared upon a subsidiary's shares, was held to be invalid. The shares of the subsidiary were all owned by the holding company, which dominated and controlled its operations and affairs, and possessed its properties and funds. The Supreme Court said, "While the two companies were separate legal entities, yet in fact, and for all practical purposes they were merged, the former [the subsidiary] being but a part of the latter [the holding company], acting merely as its agent and subject in all things to its proper direction and control." Under somewhat analo-

gous facts, similar conclusions were reached in *Gulf Oil Corporation* v. *Lewellyn, supra*, and *Palmolive Manufacturing Co. (Ontario) Ltd.* v. *The King, supra.*

In *North Jersey Title Insurance Co.* v. *Commissioner* (C. C. A., 3d Cir.), 84 Fed. (2d) 898, where the taxpayer had formed a subsidiary corporation to hold and sell certain real estate which it was obliged to take over in order to protect its business, the court upheld the contention of the taxpayer that it should be permitted to include income and losses of its subsidiary in its income tax return, basing its decision on the fact that the only purpose of the subsidiary corporation was to act as agent for and on behalf of its parent, and that, while in form they were admittedly two separate entities, in substance there was but one enterprise.

In *Munson S. S. Line* v. *Commissioner* (C. C. A., 2d Cir.), 77 Fed. (2d) 849, a parent corporation, which took possession of and operated vessels belonging to wholly owned subsidiary corporations and retained the earnings of such vessels, making only a bookkeeping division thereof, was held to be the "owner" of such vessels within a statute offering to the "owner" of a vessel documented in the United States and operated in foreign trade, the allowance of a deduction for computation of war profits and excess profits taxes, as an inducement to invest earnings in additional ships.

We believe that the facts shown in our findings justify and require that we disregard the separate corporate entity and "deal with the substance of the transaction as if the corporate agency did not exist"; for the circumstances before us are quite "exceptional", if not unique, and create a "peculiar situation." We shall not attempt to point out all the facts upon which we rely in reaching this conclusion; but it may not be amiss to advert to some of them.

Substantially all of the activities of Rayben Limited in Canada were handled by "dummy" (but we use the word in no opprobrious sense) directors and officers, all of whom were either officers or employees of the Canadian law firm retained by Cohn, Inc., to bring about the organization and incorporation of Rayben Limited under the laws of Canada. They received no compensation from Rayben Limited, had no beneficial interest in the corporation, and were never in the United States in connection with any of its business. They approved and accepted the offer made by Cohn, Inc., under date of May 30, 1927, to transfer and assign the gas stocks to Rayben Limited in exchange for all of its capital stock. When, in August 1927, the gas stocks were transferred into the name of Rayben Limited, they designated Milton E. Getz as treasurer of Rayben Limited, though he was not even a stockholder of Rayben Limited at that time. He was, however, the vice president of Cohn, Inc. He was given the

exclusive custody of the securities of Rayben Limited and the then members of the board of directors of Rayben Limited, which still consisted only of the officers and employees of the Canadian law firm, adopted a resolution providing that all of the corporate funds of Rayben Limited be deposited with the Union Bank & Trust Co. of Los Angeles, California. At about the same time one of the members of the law firm transferred one share of stock to Ben R. Meyer, who then became a director and vice president of Rayben Limited. Thereupon the directors of Rayben Limited authorized the Union Bank & Trust Co. to pay out the funds of the company upon checks or drafts signed by Meyer or Getz.

The only other activities of the officers and directors of Rayben Limited, in Canada, prior to November 15, 1927, consisted of formally approving and signing agreements concerning the sale, or the contemplated sale, of the gas stocks. It is significant that all of such agreements were prepared in the United States after extended negotiations conducted by Meyer, who at all times was president of Cohn, Inc., and that none of the agreements was ever changed in any material way in Canada. It is also significant that the officers and employees of the Canadian law firm, who, during most of the time the negotiations were being carried on, constituted a majority of the board of directors of Rayben Limited, never saw any of the agreements until they were brought to Canada for their formal approval and signature.

During the whole of the period, then, from May 27, 1927, to November 15, 1927, the activities of Rayben Limited in Canada were confined to the activities of its "dummy" directors and officers who, it is apparent, were dominated and controlled by Cohn, Inc. During this period it had no property or funds in Canada, all of its property and funds registered in its name being in the United States in the custody, possession and control of Meyer and Getz, and it transacted no business in Canada. When the sale of the utility stocks was imminent, Meyer disregarded the "exclusive custody" which had been vested in Getz, and took the stocks to Canada on November 15. On November 16, the day preceding the delivery of the stock to the purchaser, the board of directors of Rayben Limited held a meeting, the only directors present being Meyer, Rollin Browne, a member of the firm of New York attorneys who had been made a director of Rayben Limited in August, and Hugessen, the "dummy" director and president. They saw to it that the interests of Cohn, Inc., were well protected by passing resolutions that the funds of Rayben be deposited with Cohn, Inc., and that Meyer and Getz only be authorized to draw checks or drafts against these funds. When on the following day Meyer delivered the stock to the

purchaser and received the consideration, he immediately transferred substantially all of the cash received, with the exception of amounts necessary to defray the expenses incident to the sale, to Los Angeles, where it was turned over to Cohn, Inc., in the form of a loan.

The only other transaction entered into by Rayben Limited in Canada was in January 1928 when part of the bonds received on November 17 were delivered to the bankers in Canada for cash. The cash, however, was immediately transferred to Los Angeles. The gentlemen we have heretofore referred to as "dummy" directors and officers of Rayben Limited then resigned, Meyer became president, Getz became vice president, and Margaret E. Feehan, a bookkeeper for Cohn, Inc., became its secretary. They held the same offices in Cohn, Inc. On February 17, 1928, a letter was addressed to Rayben · Limited at Montreal, signed by Getz, as vice president of Cohn, Inc., and Margaret E. Feehan, as secretary, offering to transfer all the assets of Cohn, Inc., to Rayben Limited in consideration of the cancellation of all indebtedness owing by Cohn, Inc., to it and the assumption by it of all liabilities of Cohn, Inc. Getz, as vice president of Rayben Limited and Margaret E. Feehan, as secretary of that corporation accepted the offer on the same day. Rayben Limited then moved into the office of Cohn, Inc., in Los Angeles, its name was changed to "Kaspare Cohn Company Limited", the ledger of Cohn, Inc., became the ledger of Rayben Limited, and as a result of these manipulations, Cohn, Inc., had $2,610,000 of the proceeds of the sale and its transplanted offspring had all of its assets. Obviously it made no difference to Cohn, Inc., at that time whether its assets were carried in its name or in that of its *alter ego*.

Cohn, Inc., acting through its president, Ben R. Meyer, was the unquestioned master and dominated and controlled every move that was made from the time it became apparent in May 1927 that the bankers would purchase the gas stocks until the proceeds of the sale were safely deposited in Los Angeles, California. He directed the organization of Rayben Limited; employed New York attorneys to act for the petitioners before Rayben Limited was incorporated; wrote the letter offering to transfer the gas stocks to Rayben Limited; took a prominent part in all of the negotiations in the United States leading to the consummation of the sale; caused the gas stocks to be transferred into the name of Rayben Limited; had a schedule prepared under his supervision in New York City showing the precise amount of cash and bonds each of the record holders of the gas stocks was to receive; took the gas stocks to Canada; received the consideration; transferred it to the bank of which he was president in California; and paid the legal expenses and broker's commission.

He had, as he expressed it, "verbal authority" from a majority of the stockholders and directors of Cohn, Inc., to act for that corporation in connection with the sale of the gas stocks. He had no such authority from Rayben Limited or its Canadian officers and directors and he needed none. He had employed the members of the Canadian law firm to do what he wanted done and that is all that they ever did. They served him and Cohn, Inc., just as they would have served any other client.

We can not escape the conclusion that Rayben Limited was acting as a mere agency or instrumentality of Cohn, Inc., in transferring the gas stocks to the Southern Corporation and receiving the consideration therefor. All of the facts show that it was created and brought into being by its parent for that very purpose. Cohn, Inc., never participated in the affairs of Rayben Limited in the manner that a parent corporation normally participates in the affairs of a subsidiary but, through its president, Meyer, dominated and controlled its every move, especially during the period before it was transplanted in the United States. The whole transaction is not "in fact what it appears to be in form", and what was actually done "contradicts the apparent transaction." (*Chisholm* v. *Commissioner*, 79 Fed. (2d) 14; certiorari denied, 296 U. S. 641.) We hold that Cohn, Inc., was the real owner and vendor of the gas stocks when the sale was made. "To hold otherwise would be to exalt artifice above reality." *Gregory* v. *Helvering*, 293 U. S. 465. We do not rest our decision upon the fact that the obvious purpose of the Canadian formalities was to escape taxation on the profit from the sale of the gas stocks. We recognize that a taxpayer has the legal right to decrease the amount of what otherwise would be its taxes by means which the law permits. *Gregory* v. *Helvering*, *supra*. But "fictional corporate camouflage can not be made the device to escape taxation." *North Jersey Title Insurance Co.* v. *Commissioner*, 84 Fed. (2d) 898. It follows that the profit derived from the sale, to the extent hereinafter set out, should be included in the gross income of Cohn, Inc., for the year 1927.

Having concluded that Cohn, Inc., owned and sold the stocks, we need not discuss the other questions raised by the parties upon brief One is whether the sale was consummated in the United States or in Canada; the other is whether the accounts of the two petitioners should be consolidated and the profit thus be allocated to Cohn, Inc., under the provisions of section 240 (f) of the Revenue Act of 1926. If we are correct in our conclusion that the sale was made by Cohn, Inc., then it is liable for any tax upon the profit, regardless of whether the sale was made in the United States or elsewhere. (Sec. 213 (a), *supra*.) It is therefore unnecessary to determine where the sale was

made. It is likewise unnecessary to decide whether the accounts of the two corporations should be consolidated; for, if so, the only effect would be to allocate the profit to Cohn, Inc. We must, however, decide whether the transfer of the gas stocks to the Southern Corporation, which we have heretofore referred to as a sale, was in fact, as petitioners contend, a partially tax-free reorganization, the gain from which is not recognizable in any event in excess of the amount of the cash received.

The pertinent provisions of the Revenue Act of 1926 are set forth in the margin.[2] In order to bring the transaction here in controversy within these provisions, petitioners must show (1) that there was a plan of reorganization; (2) that the Southern California Gas Co., the Midway Gas Co., and the Southern California Gas Corporation, were all parties to a reorganization; and (3) that there was an exchange of stock in one or more of these corporations for stock or securities in one of the others, and cash, pursuant to the plan of reorganization.

The plan relied upon by petitioners is embodied in the agreement of October 17, 1927. It provided for the organization of a new corporation called the Southern California Gas Corporation; for the acquisition by the Southern Corporation of not less than 95 percent of the common stock of the Southern Co. and not less than 95 percent of the capital stock of the Midway Co. from the stockholders of those companies, in exchange for collateral trust bonds of the Southern Corporation to the extent of about 60 percent of the consideration and cash as to the balance; it provided further for the acquisition by the Southern Co. of all the assets of the Midway Co. in exchange for stock

---

[2] SEC. 203. (a) Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 202, shall be recognized, except as hereinafter provided in this section.

\* \* \* \* \* \* \*

(b) (2) No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\* \* \* \* \* \* \*

(d) (1) If an exchange would be within the provisions of paragraph (1), (2), or (4) of subdivision (b) if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

\* \* \* \* \* \* \*

(h) (1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation or substantially all the properties of another corporation), \* \* \*

(h) (2) The term "a party to a reorganization" includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

and bonds of the former, and that the Midway Co. be liquidated and distribute to the Southern Corporation its pro rata share of the 80,000 shares of the Southern Co.'s common stock which the Midway Co. received for its assets.

Section 203 (h) (1) of the Revenue Act of 1926, *supra*, provides that the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation is included within the meaning of the term "reorganization." The Midway Co. had but one class of stock and had outstanding 23,264 shares. Its shareholders delivered 23,121 shares of this stock to the Southern Corporation on November 17. The Southern Corporation had outstanding on October 17, 1927, 240,000 shares of common stock and 166,879 shares of preferred, both classes of stock having equal voting rights. It later issued 80,000 additional shares of common stock which were delivered to the Midway Co. as part consideration for its property and assets. On November 17 the Southern Corporation received from the stockholders of the Southern Co. 239,608 shares of that company's common stock and when the Midway Co. liquidated on December 10 it received 79,508 of the 80,000 shares of the Southern Co.'s common stock which had been transferred to the Midway Co. It is apparent therefore that the plan embodied in the agreement of October 17 was a plan of reorganization, the Southern Corporation having acquired more than a majority of the total number of shares of the voting stock of the Southern and Midway Companies. Neither of these companies had outstanding any nonvoting stock.

The Southern Corporation and the Southern and Midway Companies are clearly parties to a reorganization within the meaning of section 203 (h) (2), *supra*, which provides that "a party to a reorganization" includes both corporations in the case of the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

We are of the opinion that the transaction here in controversy falls within the exchange and reorganization provisions of the statute, as Cohn, Inc., and the other stockholders of the Southern and Midway Companies transferred their stock in these two companies to the Southern Corporation in exchange for bonds of the latter, and cash. By reason of the receipt of the bonds, the stockholders acquired a definite and material interest in the affairs of the Southern Corporation which represented a substantial part of the value of the stock transferred. The exchange was made pursuant to a plan of reorganization, and we hold that under the provisions of section 203 (d) (1), *supra*, the taxable gain to be recognized is limited to the

amount of the cash received, although the actual gain is in excess of this amount. *Helvering* v. *Watts*, 296 U. S. 387; *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378; *Lilienthal* v. *Commissioner*, 80 Fed. (2d) 411; *Miller* v. *Commissioner*, 84 Fed. (2d) 415.

The profit from the sale of the utility stocks, to the extent of the cash received, should be added to the gross income reported by Cohn, Inc., for the year 1927. Having held that Cohn, Inc., and not Rayben Limited, made the sale, it follows that no part of the profit realized should be included in the gross income of Kaspare Cohn Co. Limited (formerly Rayben Limited) for the fiscal year ended October 31, 1928.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

TURNER, concurring: I concur in the conclusion reached in the majority opinion that the gain realized upon the sale of the stock in question is taxable to the petitioner, but for a different reason. In my opinion the facts definitely show that the sale was made in the United States and under the circumstances it matters not whether it was made by Cohn, Inc., or by Rayben Limited.

ARUNDELL agrees with the above.

---

LEECH, dissenting: In my judgment, the theory upon which the majority opinion is supported, is not tenable. That theory seems to be that Rayben Limited, organized for the purpose of avoiding income taxes by its incorporator, but still existing and now owning the assets and business of that incorporator, Kaspare Cohn Co., shall be recognized for income tax purposes in a sale of its corporate property, merely as agent of its stockholders and shall there be deemed, only, a "fictional corporate camouflage * * * device to escape taxation", where such sale was conceived by its organizer before its incorporation, although no contract to sell then existed.

In my judgment, the legality of the corporate status and acts of Rayben Limited, its continued existence and present ownership of the proceeds of the disputed sale, contradict conclusively any such fictional characteristic. Nor does any authority cited in the majority opinion, or otherwise, so far as I know, justify the limitation of recognition of a corporation as a separate entity, in the status of principal, to those of its acts which were conceived after its incorporation. And, although conceding "that a taxpayer has the legal right to decrease the amount of what otherwise would be its taxes by means which the law permits", the conclusion of the prevailing opinion nullifies that conceded rule.

Moreover, I do not think a conclusion resulting in a deficiency in these proceedings can be sustained on any sound legal ground.

The purpose in organizing Rayben Limited is not material here. Cf. *Gregory* v. *Helvering*, 293 U. S. 465. The record discloses that the stocks in question were legally, effectively, and unconditionally transferred to a corporation in exchange for all of the stock of that corporation. The Revenue Act of 1926, section 203 (b) (4),[1] is unambiguous. In my opinion, it is controlling. It may have been a legislative mistake that, under this act, the gain from such a trans-action as is presented should escape tax. But that mistake, particularly in a taxing statute, affords the Board no proper authority for supplying, as it seems to me the majority opinion does, what Congress omitted. That Congress realized that this very so-called "serious loophole for avoidance of taxes" existed under the applicable revenue act, *supra*, is clearly established by the Report of the Ways and Means Committee to the House of Representatives, accompanying the Revenue Act of 1932.[2] That legislation could and did supply the omission which Congress recognized existed in the earlier law.[3]

---

[1] RECOGNITION OF GAIN OR LOSS FROM SALES AND EXCHANGES.

Sec. 203. (b) (4) No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

[2] House of Representatives, 72d Congress, 1st sess., Rept. No. 708, p. 20:

Property may be transferred to foreign corporations without recognition of gain under the exchange and reorganization sections of the existing law. *This constitutes a serious loophole for avoidance of taxes.* Taxpayers having large unrealized profits in securities may transfer such securities to corporations organized in countries imposing no tax upon the sale of capital assets. Then, by subsequent sale of these assets in the foreign country, the entire tax upon the capital gain is avoided. For example, A, an American citizen, owns 100,000 shares of stock in corporation X, a domestic corporation, which originally cost him $1,000,000 but now has a market value of $10,000,000. Instead of selling the stock outright A organizes a corporation under the laws of Canada to which he transfers the 100,000 shares of stock in exchange for the entire capital stock of the Canadian company. *This transaction is a nontaxable exchange.* The Canadian corporation sells the stock of corporation X for $10,000,000 in cash. The latter transaction is exempt from tax under the Canadian law and is not taxable as United States income under the present law. The Canadian corporation organizes corporation Y under the laws of the United States and transfers the $10,000,000 cash received from the sale of corporation X's stock in exchange for the entire capital stock of Y. The Canadian corporation then distributes the stock of Y to A in connection with a reorganization. By this series of transactions, A has had the stock of X converted into cash and now has it in complete control. [*Emphasis supplied.*]

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(k) *Foreign Corporation.*—In determining the extent to which gain shall be recognized in the case of any of the exchanges or distributions (made after the date of the enactment of this Act) described in subsection (b) (3), (4), or (5), or described in so much of subsection (c) as refers to subsection (b) (3) or (5), or described in subsection (d) or (g), a foreign corporation shall not be considered as a corporation unless, prior to such exchange or distribution, it has been established to the satisfaction of the Commissioner that such exchange or distribution is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes.